ON OBJECTIONS TO MAGISTRATE'S DECISION DECISION
{¶ 1} Relator, Douglas R. Stettler, commenced this original action requesting a writ of mandamus that orders respondent Industrial Commission of Ohio to vacate its order terminating permanent total disability compensation, declaring overpayment and finding relator fraudulently obtained the compensation, and to enter an order reinstating permanent total disability compensation.
 {¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision the magistrate concluded that: "(1) the commission applied the incorrect standard for terminating [permanent total disability] compensation; and (2) the commission's finding that the compensation was fraudulently obtained is not supported by some evidence upon which the commission relied." (Magistrate's Decision, at ¶ 36.) Accordingly, the magistrate determined this court should issue a writ of mandamus.
 {¶ 3} The Industrial Commission filed objections to the magistrate's findings of fact and conclusions of law. In its objections to the magistrate's findings of fact, the commission contends the magistrate failed to make the undisputed factual findings noted in the commission's objections. The vast majority of the matters allegedly omitted are contained within findings of fact numbers 11, 12 and 13 of the magistrate's decision. Moreover, to the extent the magistrate failed to explicitly include some of the facts the commission notes, those findings are not pivotal to the determination of this action.
 {¶ 4} The commission also contends the magistrate wrongly reached "key conclusions of fact." (Objections, at 3.) Specifically, the commission contends the magistrate wrongly concluded Carroll Fink and relator had been personal friends for some 30 years, and then used that incorrect finding to conclude that no evidence indicates relator "is capable of sustained remunerative employment in any other setting other than Fink's Used Cars where the owner has been a personal friend for some 30 years." (Magistrate's Decision, at ¶ 58.)
 {¶ 5} According to Fink's signed written statement, he has been in the used car business for 40 years, and in the course of owning the business had the occasion to make the acquaintance of relator: "I have known Mr. Stettler for approximately 30 years." (Magistrate's Decision, at ¶ 27.) While the commission is correct that Fink did not refer to relator as a personal friend, he nonetheless referred to relator as an acquaintance of 30 years. Whether we apply "acquaintance" or "personal friend" into the magistrate's conclusions of law subject of the commission's objections, is immaterial to the ultimate determination to be made in this action.
 {¶ 6} The commission further objects to the magistrate characterizing relator's activities at the dealership as "occasional." While the commission correctly notes that the evidence indicates relator was present four to five hours per day, the evidence also indicates that he was not necessarily working during that entire time. Accordingly, we cannot say that the magistrate's conclusion is erroneous.
 {¶ 7} Finally, the commission contends the magistrate erred in characterizing relator as "legally unsophisticated." Again, the commission is correct that the record does not speak to relator's legal knowledge, but the magistrate's characterization is apt if relator is compared to, for example, an attorney. As a result, the commission's contention is unpersuasive.
 {¶ 8} Accordingly, the commission's objections to the magistrate's findings of fact are overruled.
 {¶ 9} In objecting to the magistrate's conclusions of law, the commission reargues those matters addressed in depth in the magistrate's decision. As the magistrate correctly determined, the commission applied the incorrect standard in terminating permanent total disability compensation, as it found relator was "working" at Fink's Used Cars. The test is whether relator was capable of or found engaged in sustained remunerative employment. As the magistrate appropriately noted, "answering the telephone and acting as the so-called `go between' with Mr. Fink and the other dealers calling in their prices for automobiles can be viewed as work. Also, that relator was allowed to drive a Fink's Used Cars vehicle for his personal use can be viewed as remuneration. However, that relator engaged in some degree of work for remuneration does not automatically satisfy the standard for terminating [permanent total disability] compensation." (Magistrate's Decision, at ¶ 45.)
 {¶ 10} Noting that the commission failed to address the key question of whether the work for which relator was remunerated constitutes sustained remunerative employment, the magistrate, construing all evidence most favorably to the commission's decision, concluded "that the evidence falls short of constituting some evidence supporting a determination that relator was engaged in sustained remunerative employment during receipt of [permanent total disability] compensation." (Magistrate's Decision, at ¶ 47.) As the magistrate observed, "there is no finding that relator is capable of sustained remunerative employment in any other setting" than Fink's Used Cars where he is allowed to participate on the somewhat limited and sporadic basis noted in the pertinent evidence. (Magistrate's Decision, at ¶ 58.) Moreover, we agree with the magistrate's conclusion that the evidence is insufficient to support a finding that relator intended to commit fraud.
 {¶ 11} Accordingly, we overrule the commission's objections to the magistrate's conclusions of law.
 {¶ 12} Following independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we grant a writ of mandamus that orders respondent Industrial Commission of Ohio to vacate its staff hearing officer's order of April 15, 2004, and to enter a new order that denies the bureau's January 26, 2004 motion and that reinstates the permanent total disability compensation award set forth in the staff hearing officer's order of January 24, 2002.
Objections overruled; writ granted.
Petree and Travis, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Douglas R. Stettler, :
 Relator, :
v. : No. 04AP-1290
Mid Atlantic Canners Association, Inc., : (REGULAR CALENDAR)
Bureau of Workers' Compensation :
and Industrial Commission of Ohio, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on July 14, 2005. Lee M. Smith Associates Co., L.P.A., Elizabeth P. Weeden and Lee M.Smith, for relator.
Jim Petro, Attorney General, and William J. McDonald, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 13} In this original action, relator, Douglas R. Stettler, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") compensation and declaring an overpayment, and also finding that relator fraudulently obtained the compensation, and to enter an order reinstating PTD compensation.
Findings of Fact:
 {¶ 14} 1. On December 9, 1998, relator sustained an industrial injury while employed as a supervisor at a plant where Coca-Cola products are bottled. The plant was operated by respondent Mid Atlantic Canners Association, Inc., a state-fund employer. The injury occurred when relator's jacket was caught in a packaging machine. He sustained multiple fractures and contusions on the date of injury. He was hospitalized for three weeks initially and underwent multiple surgeries initially and thereafter.
 {¶ 15} 2. The industrial claim is assigned claim number 98-595269 and is allowed for:
FRACTURE MIDDLE/PROXIMAL PHALANX, HAND-OPEN, RIGHT SECOND FINGER; FRACTURE HUMERUS SHAFT-CLOSED, LEFT; FRACTURE UPPER END TIBIA-CLOSED, LEFT; OPEN WOUND OF FOREARM, LEFT; CONTUSION SHOULDER REGION, LEFT; OPEN WOUND OF SHOULDER, LEFT; OPEN WOUND OF CHEST, LEFT; CONTUSION OF CHEST WALL, LEFT; FRACTURE ONE RIB-CLOSED, LEFT; (RIGHT) RADIAL DIGIT NERVE; (LEFT) NECK HUMERUS; (LEFT) CARPI ULNAR NERVE MUSCLE; (RIGHT INDEX FINGER); (LEFT) HUMERAL SHAFT; (LEFT) BRACHIAL PLEXUS; (LEFT) HUMERUS; LEFT KNEE ARTHROPATHY; POST TRAUMATIC STRESS SYNDROME.
 {¶ 16} 3. On July 27, 2001, relator filed an application for PTD compensation. In support, he submitted a report from William D. Allen, M.D., dated June 28, 2001, which states:
* * * [T]his patient has sustained multiple injuries and has multiple continuing and permanent impairments as a result of these industrial work injuries. Most significant of these is the left shoulder injury, where he sustained a brachial plexus lesion. This has resulted in marked weakness and atrophy of the left shoulder and essentially a flail shoulder. Although patient has intact motor function in the left fingers and hand, the left upper extremity is really not useful to him as he cannot position this arm for functional activities because of the profound shoulder weakness.
The patient also has impairment of the right upper extremity secondary to previous index finger trauma and has subse-quently been left with an amputation of the index finger. He also has lower extremity impairment involving post-traumatic arthritis of the left knee following a tibial plateau fracture. Because of the pain associated with this, he cannot tolerate standing or walking for even very short distances.
* * * It is my medical opinion that the patient is not capable of sustaining gainful employment, even with restriction[s]. As noted he has impairment of both of his upper extremities and also his left lower extremity. I do not believe that this combination of impairments would enable him to sustain gainful employment, even at a light/sedentary level. * * *
 {¶ 17} 4. On October 11, 2001, relator was examined at the commission's request by John W. Cunningham, M.D., who wrote:
* * * This individual has a 55% whole person PPI in regards to this claim. In my medical opinion, this individual is capable of physical work activity in sedentary work. However, this individual is employable in sedentary work with no use of the left arm above elbow level, and it must be remembered that his most significant injury is to his dominant left arm and his nondominant right arm has an amputation of the index finger. Vocational Rehabilitation Services could return this individual to the workplace, in this examiner's opinion, with appropriate computer/keyboard skill training. However, this individual is not employable as he was employed on the date of injury in question, and he is not employable in an industrial factory environment on the basis of this claim and this claim only. This individual is employable only in a clerical office setting and then would require significant vocational rehabilitation services as discussed above. * * *
 {¶ 18} 5. Also on October 11, 2001, relator was examined at the commission's request by psychiatrist Donald L. Brown, M.D. Dr. Brown examined only for the post-traumatic stress syndrome. Dr. Brown wrote:
* * * I believe that he is stabilized with respect to his pre-viously allowed posttraumatic stress syndrome and that it is in at least partial remission. I believe that this allowance would prevent him from returning to his former position of employment or any employment around production machinery but would not prevent him from other forms of sustained remunerative employment.
* * *
In my opinion, Mr. Stettler has reached MMI with respect to his previously allowed posttraumatic stress syndrome and can be considered permanent. Utilizing the Fourth Edition of the AMA Guides to the Determination of Permanent Impairment, I would rate him as having a Class III level of impairment. This is a moderate level of impairment. Utilizing the percentages from the second edition in the fourth edition, I would rate his impairment at 30%.
 {¶ 19} 6. Following a January 24, 2002 hearing, a staff hearing officer ("SHO") issued an order granting PTD compensation starting June 23, 2001. The award was based upon the medical reports from Drs. Allen, Cunningham and Brown and consideration of the nonmedical factors. For the nonmedical factors, the SHO order of January 24, 2002 explains.
Vocationally, the claimant is currently age 49, and he completed high school in 1970. His work history involves jobs in the Army, as a car salesman, as a dispatcher for a trucking company, and in a factory. Part of this factory work included time as a supervisor. As noted previously, the claimant is left handed, and he requires a cane to walk. The claimant's age, education and work history could conceivably be seen as positive factors in an individual with less overwhelming physical disabilities. However, due to the variety and extent of the claimant's physical and psychological impairments, it is found that he does not maintain the vocational capacity to return to any type of employment.
In summary, this claimant has physical restrictions regarding his entire left arm and shoulder, his right hand, and his left knee. In addition, there is a psychiatric impairment which has been rated at a moderate level. As noted above, Dr. Cunningham noted that the claimant could perform less than a full range of sedentary work. Also as noted above, it is found that the claimant does not maintain the vocational potential to benefit from rehabilitation services. It is therefore found that he is permanently and totally disabled due to the conditions allowed in this claim.
 {¶ 20} 7. The SHO order awarding PTD compensation was mailed to relator on February 5, 2002. Approximately two months later, on April 3, 2002, relator signed and returned an Ohio Bureau of Workers' Compensation ("bureau") letter containing the following query: "Are you currently working or have you worked since you were granted PTD benefits?"
 {¶ 21} In response to the query, relator circled the word "No."
 {¶ 22} 8. The special investigations unit ("SIU") of the bureau received information from a "confidential source (AKA Ellery)," that relator "has been working for the past year" for Fink's Used Cars located at Zanesville, Ohio. The record fails to disclose when SIU received this information which prompted an SIU investigation and generated a report.
 {¶ 23} 9. According to the SIU report, on September 11, 2002, special agent Bradley E. Lear arrived at relator's residence in Zanesville at 7:15 a.m. Lear observed a red Ford Expedition with a dealer tag registered to Fink's Used Cars. On that same day, Lear arrived at Fink's Used Cars at 12:45 p.m., and observed that the Ford Expedition was parked there. When Lear left Fink's Used Cars at 3 p.m., the Ford Expedition was still there.
 {¶ 24} 10. According to the SIU report, on September 24, 2002, Lear arrived at relator's residence and again observed the Ford Expedition parked there. Thereafter, Lear observed that relator arrived at Fink's Used Cars at 8:30 a.m., driving the Ford Expedition. Relator was observed entering the offices of Fink's Used Cars.
 {¶ 25} 11. According to the SIU report, on January 6, 2003, Lear spoke to confidential source Ellery:
* * * Ellery stated that Mr. Stettler is still working at Fink's and is paid cash by the owner Carroll Fink. Ellery stated that Mr. Stettler has been working for at least a year and works in the office on the phone. Ellery stated that Mr. Stettler phones other dealers in Ohio and Canada and sells cars wholesale.
 {¶ 26} 12. According to the SIU report, on January 22, 2003, special agent Scott Bunting interviewed Carroll Fink, the owner of Fink's Used Cars:
* * * Mr. Fink stated that Mr. Stettler would act as a go between for him and other dealers. In this capacity, Mr. Stettler would relay what models were available, prices of those models and make transfer arrangements for those vehicles. Mr. Fink stated that Mr. Stettler was allowed to use a lot vehicle free of charge. This was in return for his assistance at the dealership. Mr. Fink stated that the vehicle Mr. Stettler would drive had a dealer plate and that any accident caused by Mr. Stettler was to be filed under his insurance. Mr. Fink stated that other individuals that hang around the dealership would not be allowed to drive vehicles. Mr. Fink stated Mr. Stettler had previous history of working for an auto dealership in the past.
 {¶ 27} 13. According to the SIU report, on January 29, 2003, Bunting obtained a signed written statement from Carroll Fink. The signed written statement of Carroll Fink reads:
I am the owner of Fink[']s Used Cars. I have owned said business for 40 years. In the course of owning said business, I have had occasion to make acquaintance with Doug Stettler. I have known Mr. Stettler for approximately 30 years. Mr. Stettler has had prior experience in the auto industry, having worked at Dutro Ford in the past.
Doug Stettler has been coming to our lot for approximately the past 12 months.
While on our premises Doug Stettler will answer phones and take messages from other dealers, Etc. He is present approximately 4 to 5 hours per day on average.
Doug Stettler will then relay those messages to myself regarding pricing on vehicles, for other dealers. I will then give him my decision, and he will in turn relay answers to any party in question. In effect he will act as a "go between" for myself, when I am too busy to interact with a party.
Doug Stettler normally drives a vehicle from our lot with a dealer plate. Mr. Stettler is not paid any form of wages or paid anything for meals Etc. He is merely allowed to drive a lot vehicle.
I would like to state that I was fully unaware that Mr. Stettler was declared permanently and totally disabled. Therefore, I was not aware he is unable to do any form of work.
I have been completely cooperative during the course of this investigation.
 {¶ 28} 14. According to the SIU report, on January 31, 2003, field agent Stuart Lee and Lear interviewed relator at the bureau's service office:
* * * FA Lee and SA Lear made sure that Mr. Stettler was aware that the interview was voluntary. Mr. Stettler stated he was aware that he could not work and received [sic] benefits from the BWC. Mr. Stettler stated he has been friends with Carroll Fink for 30 years. Mr. Stettler stated during the past 12 months he has acted as a go between with Mr. Fink and other car dealers on the phone. Mr. Stettler stated that in exchange for that friendship and the phone work he is allowed to borrow vehicles from Mr. Fink. Mr. Stettler stated that he does not have to make a monthly payment and he does not have to pay for insurance on the vehicles he drives. Mr. Stettler stated that he goes to the dealership almost everyday and is usually there anywhere between one to five hours depending on what he has to do. Mr. Stettler stated he did work for Dutro Ford 5th and Canal St. Zanesville, Ohio 43701 from 1978 to 1983. Mr. Stettler stated that while employed with Dutro he worked as [a] new and used car manager and in sales. Mr. Stettler stated that the work at Dutro's was not the same type of work he does at Fink's. Mr. Stettler states the [sic] he doesn't consider what he does at Fink's to be work. Mr. Stettler stated he does not receive a check or cash for the work; he only borrows vehicles from Mr. Fink. Mr. Stettler stated that some days he does not do any work when he is there and it just depends on how busy the dealership is.
 {¶ 29} 15. The record contains a signed written statement dated January 31, 2003 from relator stating:
I was originally injured while employed with Mid Atlantic Canners Zanesville OH. I began receiving permanent total benefits in * * * 2002. I am aware that I cannot work and receive benefits from the BWC. I have not read the fraud warning on the back of the BWC warrants. I have been friends with Carroll Fink of Fink's Used Cars, for 30 years. In the past 12 months I have acted as a go between with Mr. Fink and other dealers on the phone. I take messages for Mr. Fink and call dealers for Mr. Fink when Mr. Fink needs me to. In exchange for being a friend and the phone work Mr. Fink lets me borrow vehicles. The vehicles have Fink's dealer tags and I don't have any monthly payment, and I don't pay for insurance. I do supply gas for the vehicle. I go to the dealership almost everyday and I am there from 1 to 5 hours depending on what I have to do. Prior to working for Mid Atlantic I work[ed] for another local dealership Dutro's Inc 5th + Canal St. Zanesville OH. I worked from 1978 to 1983. I worked as a new + used car MGR and in sales. The phone activities I do at Fink's is not the same type of work I did at Dutro's. I don't consider what I do at Fink's to be work. I do not receive cash or check or payment. I only borrow vehicles from Mr. Fink. There are some days I don't make any calls or do anything I am just hanging out. On other days I may only make 1 or 2 phone calls. The activities vary from day to day depending on how busy it gets at the dealership and I am at the dealership.
 {¶ 30} 16. On January 26, 2004, almost one year from the date SIU obtained the signed written statement from relator, the bureau moved to terminate PTD compensation, for a declaration of an overpayment, and a finding that the compensation was fraudulently obtained. There is no explanation in the record as to why the bureau waited almost one year to file its motion.
 {¶ 31} 17. Following an April 15, 2004 hearing which was apparently not recorded, an SHO issued an order stating:
It is the order of the Staff Hearing Officer that the Bureau of Workers' Compensation Motion filed 01/26/2004 is granted to the extent of this order.
(1) The Staff Hearing Officer terminates permanent total disability compensation, effective 04/03/2002, the date that the injured worker stated he was not working pursuant to Bureau of Workers' Compensation letter dated 04/03/2002 and signed by the injured [worker]. (2) The Staff Hearing Officer declares permanent total disability overpaid due to Mr. Stettler working from 04/03/2002 to present. (3) The Staff Hearing Officer declares a ruling of fraud for benefits paid to Mr. Stettler from 04/03/2002 to present.
The Staff Hearing Officer finds that the injured worker was working while receiving permanent and total disability benefits. The Staff Hearing Officer bases this finding on the Bureau of Workers' Compensation Special Investigations Report of Investigation dated 01/26/2004. In that report, the Bureau of Workers' Compensation Investigation Unit interviewed both Douglas R. Stettler and the owner of the car dealership, Fink[']s Used Cars, and its owner — Mr. Fink in order to support their position. The Staff Hearing Officer in turn uses those statements from interviews, which were signed and dated by the respective interviewees. The Staff Hearing Officer finds that the injured worker was working at Fink[']s Used Cars five days a week for an average of 4.5 hours per day. The work was described by the injured worker in a statement dated 01/31/2003. The injured worker stated: "In the past 12 months I have acted as a go between with Mr. Fink and other dealers on the phone. I take messages for Mr. Fink and call dealers for Mr. Fink when Mr. Fink needs me to. In exchange for being a friend and the phone work, Mr. Fink lets me borrow vehicles. The vehicles have Fink[']s dealer tags and I don't have any monthly payment and I don't pay for insurance . . .". The injured worker goes on to state that he goes to the dealership almost every day for approximately 1-5 hours depending on what he has to do. He notes that he worked for a prior local dealership from 1978 to 1983 but that this work for Mr. Fink is different. He goes on to state that some days he has more phone calls than others and, that it depends on how busy it gets at the dealership.
The statement from Donald [sic] Fink dated 01/29/2003 and taken by the Bureau of Workers' Compensation interviewer corroborates that Mr. Stettler has been working for him for the past 12 months, which would be approximately 01/29/2002. Mr. Fink describes the injured worker's job duties as follows: "While on our premises Doug Stettler will answer phones and take messages from other dealers, etc. He is present approximately 4.5 hours per day on average. Doug Stettler will then relay those messages to myself regarding pricing on vehicles for other dealers. I will then give him my decision, and he will in turn relay answers to any party in question. In effect, he will act as a "go between" for myself, when I am too busy to interact with a party." Mr. Fink goes on to state that he gives the injured worker a vehicle from Fink[']s lot with a dealer plate but that he is not paid any form of wages or paid anything for meals, etc. He is allowed to drive a lot vehicle only, according to Mr. Fink.
The Staff Hearing Officer finds that these facts indicate that the injured worker was working when he acted as a "go between" for Fink[']s Used Cars. The question becomes whether the dealer vehicle that he was provided in exchange for these services amounts to remuneration. The Staff Hearing Officer finds that it does. According to the affidavits submitted, the injured worker also stated that the dealership paid for the auto insurance, although Mr. Fink denied that. There was also uncorroborated evidence that the injured worker may have additionally been paid cash in return for his services, but the Staff Hearing Officer finds insufficient evidence to find that the injured worker was paid cash acting as a "go between".
The facts indicate that the injured worker was awarded permanent and total disability at hearing on 01/24/2002. That award was paid from 06/28/2001 and to continue without suspension. . . . As a routine matter, the Bureau of Workers' Compensation sends out to all injured workers a statement which they must return to the Bureau, certifying that they do not work. That statement is dated 04/03/2002, and is the date that the Staff Hearing Officer is using to find that the injured worker's permanent total disability benefits are terminated. That statement dated 04/03/2002 is signed by the injured worker, Douglas R. Stettler, with the question, "Are you currently working or have you worked since you were granted PTD benefits?" The injured worker circles "No" on his signed response to the Bureau of Workers' Compensation.
The Staff Hearing Officer finds that the elements of fraud have been met in this case. Those elements are as follows: (1) A representation, or when there is a duty to disclose, concealment of facts; (2) which is material to the transaction at hand; (3) made falsely with the knowledge of falsity, or with such utter disregard or recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; (6) resulting in injury approximately caused by that reliance. The Staff Hearing Officer finds that the elements are met, based on the facts in this case. In this case, Mr. Stettler had a duty to inform the Bureau of Workers' Compensation that he was working at Fink[']s Used Cars. Mr. Stettler's concealment was material to the transaction because the Bureau of Workers' Compensation would have discontinued payment of permanent total disability benefits had it known that the injured worker was working. Mr. Stettler submitted a letter dated 04/03/2002 certifying that he was not working. He intentionally misled the Bureau of Workers' Compensation by indicating on that letter that he had not been working, when he actually was working. The Bureau of Workers' Compensation relied on that certified statement justifiably in which the injured worker concealed his work activity. The Staff Hearing Officer finds that this was work activities inconsistent with receiving Workers' Compensation benefits, as previously stated. Finally, the Bureau of Workers' Compensation has suffered injury by paying compensation for permanent and total disability benefits to Mr. Stettler when, in accordance with this finding that he was engaged in sustained remunerative employment when he worked 4.5 hours per day at Fink[']s Used Cars as a "go between", which would have removed him from entitlement to permanent total disability benefits.
All evidence was reviewed and considered.
 {¶ 32} 18. On July 1, 2004, the three member commission denied relator's request for reconsideration of the SHO order of April 15, 2004.
 {¶ 33} 19. On December 2, 2004, relator, Douglas R. Stettler, filed this mandamus action.
Conclusions of Law:
 {¶ 34} Two issues are presented: (1) whether the commission applied the proper standard for determining whether relator's activities at Fink's Used Cars warranted termination of PTD compensation and the declaration of an overpayment; and (2) whether the commission's finding that the compensation was fraudulently obtained is supported by the evidence cited by the commission in its order.
 {¶ 35} The magistrate finds: (1) the commission applied the incorrect standard for terminating PTD compensation; and (2) the commission's finding that the compensation was fraudulently obtained is not supported by some evidence upon which the commission relied.
 {¶ 36} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 37} The SHO order of April 15, 2004 repeatedly states that relator was found to have been "working" at Fink's Used Cars. On that basis, it is found that relator was not entitled to PTD compensation. Not until the last paragraph of the order does the commission actually state that relator "was engaged in sustained remunerative employment" at Fink's Used Cars.
 {¶ 38} The SHO order cites no case law relating to the standard to be applied in determining whether the termination of PTD compensation is warranted. Nevertheless, a careful reading of the entire order strongly suggests that the SHO inappropriately applied the standard for determining whether a claimant's activities are inconsistent with the receipt of temporary total disability ("TTD") compensation.
 {¶ 39} Analysis begins with a review of the case law setting forth the two different standards for terminating TTD and PTD compensation when it is alleged that the compensation's recipient has engaged in activities inconsistent with its receipt.
 {¶ 40} In State ex rel. Ford Motor Co. v. Indus. Comm.,98 Ohio St.3d 20, 2002-Ohio-7038, at ¶ 18-19, the court had occasion to summarize the law pertaining to the termination of TTD compensation:
TTC is prohibited to one who has returned to work. R.C. 4123.56(A);State ex rel. Ramirez v. Indus. Comm. (1982), 69 Ohio St.2d 630, 23 O.O.3d 518, 433 N.E.2d 586. * * *
Work is not defined for workers' compensation purposes. We have held, however, that any remunerative activity outside the former position of employment precludes TTC. State ex rel. Nye v. Indus. Comm. (1986),22 Ohio St.3d 75, 78, 22 OBR 91, 488 N.E.2d 867. We have also held that activities medically inconsistent with the alleged inability to return to the former position of employment bar TTC, regardless of whether the claimant is paid. State ex rel. Parma Community Gen. Hosp. v. Jankowski,95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E.2d 1143, ¶ 15. Activities that are not medically inconsistent, however, bar TTC only when a claimant is remunerated for them. Id. at ¶ 14-15, 767 N.E.2d 1143. Work, moreover, does not have to be full-time or even regular part-time to foreclose TTC; even sporadic employment can bar benefits. State exrel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113, 717 N.E.2d 336.
 {¶ 41} Recently, in State ex rel. Lawson v. Mondie Forge,104 Ohio St.3d 39, 2004-Ohio-6086, the court had occasion to clarify the standard for terminating PTD compensation when it is alleged that the compensation's recipient had engaged in activities inconsistent with its receipt:
 {¶ 42} The Lawson court states, at ¶ 16, 19-21:
PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v. Indus. Comm.
(1987), 31 Ohio St.3d 167 * * *. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, Stateex rel. Kirby v. Indus. Comm., 97 Ohio St.3d 427, 2002-Ohio-6668 * * *; (2) the physical ability to do sustained remunerative employment, Stateex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316 * * *; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. See State exrel. Timmerman Truss, Inc. v. Indus. Comm., 102 Ohio St.3d 244,2004-Ohio-2589 * * * ¶ 26.
* * *
Neither "sustained" nor "work" has been conclusively defined for workers' compensation purposes. As to the latter, clearly, labor exchanged for pay is work. Schultz also teaches that unpaid activity that is potentially remunerative can be considered for purposes of establishing a physical capacity for remunerative employment. This principle, however, should always be thoughtfully approached, particularly when PTD is at issue.
One of the most enduring (though not often explicitly stated) misconceptions about PTD is that once it is granted, the recipient must thereafter remain virtually housebound. This is a fallacy. PTD exempts no one from life's daily demands. Groceries must be purchased and meals cooked. Errands must be run and appointments kept. The yard must be tended and the dog walked. Where children are involved, there may be significant chauffeur time. For some, family and friends shoulder much of the burden. Others, on the other hand, lack such support, leaving the onus of these chores on the PTD claimant.
These simple activities can nevertheless often generate considerable controversy. That is because all of these tasks are potentially remunerative. From the school cafeteria to the four-star restaurant, people are paid to prepare meals. People are paid for lawn and child care. Many people earn their living behind the wheel. State ex rel. ParmaComm. Gen. Hosp. v. Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336 * * *, acknowledged this and cautioned against an automatic disqualification from compensation based on the performance of routine tasks, regardless of their potential for payment. We instead compared the activities with claimant's medical restrictions to determine whether they were so inconsistent as to impeach the medical evidence underlying the disability award.
(Emphasis sic.)
 {¶ 43} To summarize the critical distinction between the two standards for terminating TTD and PTD compensation, as the Ford court makes clear, work does not have to be full time or even regular part-time to foreclose TTD; even sporadic employment can bar TTD benefits. However, as theLawson court makes clear, to terminate PTD compensation based upon claimant's activities, there must be evidence of sustained remunerative employment occurring during the period of the award or evidence of claimant's ability to do sustained remunerative employment. The standard for terminating PTD compensation contrasts sharply with the standard for terminating TTD compensation.
 {¶ 44} Reviewing the SHO order of April 15, 2004 with some degree of scrutiny, it strongly suggests that the SHO inappropriately applied the standard for terminating TTD compensation and failed to apply the correct standard for terminating PTD compensation.
 {¶ 45} In the magistrate's view, answering the telephone and acting as the so-called "go between" with Mr. Fink and the other dealers calling in their prices for automobiles can be viewed as work. Also, that relator was allowed to drive a Fink's Used Cars vehicle for his personal use can be viewed as remuneration. However, that relator engaged in some degree of work for remuneration does not automatically satisfy the standard for terminating PTD compensation. Ford; Lawson, supra.
 {¶ 46} The commission, through its SHO, failed to address the key question of whether the work for which relator was remunerated constitutes sustained remunerative employment or evidence of an ability to perform sustained remunerative employment. This was an abuse of discretion that invalidates the commission's decision.
 {¶ 47} Viewing the evidence in a light most favorable to the commission's decision, it is clear that the evidence falls short of constituting some evidence supporting a determination that relator was engaged in sustained remunerative employment during receipt of PTD compensation.
 {¶ 48} It is important to note that the only evidence before the commission was the surveillance evidence and the statements of Carroll Fink and relator. No testimony was recorded at the April 15, 2004 hearing. In fact, the parties do not claim here that any testimony was taken at the hearing.
 {¶ 49} The surveillance evidence was generated on two days — September 11 and September 24, 2002. That evidence shows that relator drove a Ford Expedition with dealer tags from his residence to Fink's Used Cars on both days. On September 11, 2002, the Ford Expedition was observed at Fink's Used Cars for 2 hours and 15 minutes before special agent Lear ended his surveillance. There is no surveillance evidence as to how long the Ford Expedition was parked at Fink's Used Cars after relator arrived there at 8:30 a.m. on September 24, 2002.
 {¶ 50} In his signed written statement, relator admits that "Mr. Fink lets me borrow vehicles." Relator also admitted that he goes to Fink's Used Cars "almost everyday and I am there from 1 to 5 hours depending on what I have to do." Mr. Fink's statements do not contradict relator's statements. Mr. Fink agreed that relator "was allowed to use a lot vehicle free of charge."
 {¶ 51} The evidence only shows that relator drove a dealer vehicle from his residence to Fink's Used Cars. There is no evidence or suggestion that relator was permitted to use the vehicle for any other purpose or to any other extent. There was no evidence as to the value of being permitted to take a lot vehicle home. Nevertheless, the value appears to be minimal.
 {¶ 52} Mr. Fink stated that relator "is present approximately 4 to 5 hours per day on average" at Fink's Used Cars. He stated that relator acts as a "go between" "when I am too busy to interact with a party."
 {¶ 53} Relator stated "there are some days I don't make any calls or do anything. I am just hanging out. On other days I may only make 1 or 2 phone calls. The activities vary from day to day depending on how busy it gets at the dealership and I am at the dealership."
 {¶ 54} Mr. Fink's statements do not contradict relator's statement. There is no evidence to contradict relator's statement that there are days he is present at Fink's Used Cars when he makes no calls and other days when he makes one or two calls.
 {¶ 55} The evidence at best shows sporadic and minimal telephone work for Mr. Fink.
 {¶ 56} There is no evidence that relator is expected to be present at Fink's Used Cars at any scheduled times during the week. It is simply understood that relator typically shows up at Fink's Used Cars everyday and that he will take calls as the need arises.
 {¶ 57} There is also no evidence or claim that relator's activities at Fink's Used Cars were physically inconsistent with the physical restrictions associated with his industrial injury. Neither the bureau nor the commission submitted medical evidence, as was the situation in the Lawson case, indicating that relator's activities show an ability to perform sustained remunerative employment.
 {¶ 58} While the commission's April 15, 2004 order concludes that relator "was engaged in sustained remunerative employment" at Fink's Used Cars, there is no finding that relator is capable of sustained remunerative employment in any other setting other than Fink's Used Cars where the owner has been a personal friend for some 30 years.
 {¶ 59} The evidence of record simply fails to show that relator was engaged in sustained remunerative employment at Fink's Used Cars. Yes, it can be said that relator occasionally engaged in work there when he answered the phone and acted as Mr. Fink's "go between." Yes, it can be said that relator was remunerated by being allowed to drive a dealer vehicle home. However, it cannot be said that relator engaged in sustained remunerative employment at Fink's Used Cars based upon the evidence of record.
 {¶ 60} The second issue, as previously noted, is whether the commission's finding that the compensation was fraudulently obtained is supported by some evidence cited by the commission in its order.
 {¶ 61} The six elements of fraud are set forth in the SHO order. In finding fraud, the SHO explained:
* * * Mr. Stettler submitted a letter dated 04/03/2002 certifying that he was not working. He intentionally misled the Bureau of Workers' Compensation by indicating on that letter that he had not been working, when he actually was working. The Bureau of Workers' Compensation relied on that certified statement justifiably in which the injured worker concealed his work activity. * * *
 {¶ 62} The April 3, 2002 letter is not some evidence of a fraudulent intent under the circumstances of this case.
 {¶ 63} Analysis begins with the observation that, at best, it can be said that relator was performing minimal and sporadic work activity for the privilege of driving a dealer vehicle to and from Fink's Used Cars. While this set of facts can be construed as "work" under the case law relating to TTD compensation, the legally unsophisticated might not view it as work. In fact, relator himself stated that he did not consider it to be "work." Under such circumstances, that relator circled "No" to the bureau's work query is not dispositive of a fraudulent intent.
 {¶ 64} Moreover, it is significant that relator's response to the bureau's April 3, 2002 inquiry occurred some five months before the SIU surveillances on September 11 and September 24, 2002.
 {¶ 65} In his January 31, 2003 signed written statement, relator admitted "in the past 12 months I have acted as a go between with Mr. Fink and other dealers." In his January 29, 2003 signed statement, Mr. Fink states that relator "has been coming to our lot for approximately the past 12 months."
 {¶ 66} While April 3, 2002 does indeed fall within the 12-month period, this magistrate cannot ignore the undisputed fact that the SIU investigation was not begun until some five months later. There is no fact-specific evidence showing relator's activities at Fink's Used Cars at or near the date relator signed and returned the letter.
 {¶ 67} In short, even if it can be said, based upon the evidence and case law, that relator had been working at Fink's Used Cars at the time he responded to the bureau's April 3, 2002 letter, that evidence is not "some evidence" of an intent to commit fraud. See State ex rel. Griffithv. Radix Wire Co., 161 Ohio App.3d 30, 2005-Ohio-2200, at ¶ 18 (this court issued a writ vacating the commission's finding of fraud).
 {¶ 68} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its SHO order of April 15, 2004, and to enter a new order that denies the bureau's January 26, 2004 motion and that reinstates the PTD compensation award set forth in the SHO order of January 24, 2002.