DECISION
{¶ 1} Relator, Roosevelt Perry, seeks a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order (1) that terminated permanent total disability ("PTD") compensation and disabled workers' relief fund ("DWRF") compensation, effective November 13, 2003, and (2) that declared an *Page 2 
overpayment of these compensations from March 14, 2002, through November 13, 2003. Relator also seeks an order that directs the commission to reinstate PTD and DWRF compensations for the period of November 13, 2003, through September 28, 2005.
 {¶ 2} After relator sustained an industrial injury in 1967 while working for Aluminum Smelting Refining Co., Inc., the commission awarded PTD compensation to him, effective June 16, 1977. Later, after correspondence from the Ohio Bureau of Workers' Compensation ("bureau") to relator was returned unanswered and after the bureau discovered that relator's listed telephone number had been disconnected, the bureau's special investigations unit placed relator under surveillance.
 {¶ 3} In September 2003, after an investigation suggested that relator was working at a car wash, the bureau moved to terminate relator's PTD compensation and DWRF compensation, and moved for a declaration of an overpayment of both compensations. After conducting a hearing, a staff hearing officer ("SHO") terminated PTD and DWRF compensations, effective November 13, 2003, and the SHO declared an overpayment of these compensations from March 14, 2002, through November 13, 2003.
 {¶ 4} Approximately two years after the SHO terminated relator's PTD and DWRF compensations, relator filed another application for PTD compensation. Another SHO subsequently awarded PTD compensation, effective September 29, 2005.
 {¶ 5} In April 2006, relator filed the instant complaint in mandamus against the commission and relator's former employer, seeking to vacate the SHO's order of *Page 3 
November 2003 that terminated PTD compensation and DWRF compensation, and that declared an overpayment of these compensations.[1]
 {¶ 6} Pursuant to former Loc.R 12(M) of the Tenth District Court of Appeals, this court appointed a magistrate without limitation of powers specified in former Civ.R. 53 to consider relator's cause of action.[2] The magistrate examined the evidence and issued a decision, wherein he made findings of fact and conclusions of law. (Attached as Appendix A.)
 {¶ 7} Finding (1) that the commission failed to apply the proper standard for determining whether relator's activities warranted termination of compensations and declaration of overpayment; and (2) that the commission's application of the proper standard could result in termination of compensations and declaration of an overpayment, the magistrate recommended issuing a limited writ of mandamus.
 {¶ 8} Both relator and the commission have filed objections to the magistrate's decision. See, generally, Civ.R. 53(D)(3)(b). Because both parties have objected to the magistrate's decision, we therefore independently review the matters to which the parties object to determine whether the magistrate properly determined the factual issues and appropriately applied the law. See Civ.R. 53(D)(4)(d).
 {¶ 9} In his objections, relator objects to the magistrate's recommendation that a limited writ of mandamus, instead of a full writ of mandamus, should be issued by this court. According to relator, the evidence does not support a finding that relator engaged *Page 4 
in actual sustained remunerative employment, and the evidence also does not support a finding that relator had the physical capacity for sustained remunerative employment. See, e.g., State ex rel. Lawson v.Mondie Forge, 104 Ohio St.3d 39, 2004-Ohio-6086, at ¶ 16, citingState ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167
(stating that "PTD pivots on a single question: Is the claimantcapable of sustained remunerative employment?"). (Emphasis sic.) Also, as relator was subsequently declared eligible for PTD compensation in 2005, relator further reasons that the facts and circumstances of this case show that he properly is entitled to full relief in mandamus.
 {¶ 10} For its part, the commission claims that relator's own statements and admissions concerning his work activities at a car wash, and evidence of relator's work activities at the car wash impeach medical evidence that supported relator's first PTD award. Because there is some evidence to support the commission's order, the commission asserts that relator is not entitled to extraordinary relief in mandamus and, therefore, the magistrate erred by recommending that limited relief in mandamus should be provided.
 {¶ 11} Alternatively, the commission contends that, if this court finds that a writ of mandamus properly lies, then this court properly should adopt the magistrate's decision as its own; and, consistent with the magistrate's recommendation, this court should issue a writ of mandamus for the limited purpose of remanding the matter to the commission for reconsideration of the bureau's motions under the proper legal standard.
 {¶ 12} "Mandamus is an extraordinary writ that must be granted with caution." State ex rel. Liberty Mills, Inc. v. Locker (1986),22 Ohio St.3d 102, 103. R.C. 2731.01 provides: "Mandamus is a writ, issued in the name of the state to an inferior tribunal, a *Page 5 
corporation, board, or person, commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station."
 {¶ 13} The threshold inquiry here is whether relator has established the jurisdictional prerequisites for issuance of a writ of mandamus.See State ex rel. Inland Div., G.M.C. v. Adams (1982), 1 Ohio St.3d 44,46.
 {¶ 14} To be entitled to a writ of mandamus, a relator must show (1) that there is a clear legal right to the requested relief; (2) that the respondent is under a clear legal duty to perform the act sought; and (3) that relator has no plain and adequate remedy at law. State ex rel.Fain v. Summit Cty. Adult Probation Dept. (1995), 71 Ohio St.3d 658, citing State ex rel. Howard v. Ferreri (1994), 70 Ohio St.3d 587, 589.
 {¶ 15} "In matters involving the Industrial Commission, the determinative question is whether relator has a clear legal right to relief. Such a right is established where it is shown that the commission abused its discretion by entering an order which is not supported by any evidence in the record." State ex rel. Valley PontiacCo., Inc. v. Indus. Comm. (1991), 71 Ohio App.3d 388, 391, citingState ex rel Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. However, "where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is inappropriate." Valley Pontiac, at 391, citing State ex rel. Lewis v.Diamond Foundry Co. (1987), 29 Ohio St.3d 56.
 {¶ 16} Here, we agree with the magistrate's conclusion thatLawson, supra, discusses the proper legal standard for determining whether a claimant properly is entitled to PTD compensation. We also agree with the magistrate's conclusion that the SHO's order of November 2003 strongly suggests that the SHO applied an incorrect legal *Page 6 
standard when she terminated PTD and DWRF compensations and declared an overpayment. See, e.g., State ex rel. Stettler v. Mid Atlantic CannersAssn. Inc., Franklin App. No. 04AP-1290, 2005-Ohio-5646, at ¶ 9.
 {¶ 17} Such apparent application of an incorrect legal standard by the SHO constitutes an abuse of discretion. See Toledo Scale Corp. v. Indus.Comm. (Aug. 12, 1993), Franklin App. No. 92AP-1650 (finding that the commission abused its discretion in applying an incorrect legal standard after the commission decided the relator's motion to terminate PTD compensation based upon the issue of whether a claimant had actually been working and not upon a claimant's ability to work); Mercado v.Chromalloy American Corp. (Sept. 20, 1990), Franklin App. No. 89AP-543 (agreeing with referee's conclusion that commission abused its discretion by applying the wrong legal standard).
 {¶ 18} Because the SHO was under a clear legal duty to apply the correct legal standard when considering the bureau's requests to terminate PTD and DWRF compensations and to declare an overpayment; because the SHO abused her discretion by applying an incorrect legal standard in reaching her determination; and because relator has no plain and adequate remedy at law, we find that relator has satisfied the jurisdictional prerequisites for issuance of a writ of mandamus.
 {¶ 19} We do not, however, agree with relator's contention that, under the facts of this case, he is entitled to full relief in mandamus. The commission, not this court, is the exclusive evaluator of weight and credibility of evidence, and determination of disputed facts is within the final jurisdiction of the commission. State ex rel. LTV Steel Co. v.Indus. Comm. (2000), 88 Ohio St.3d 284, 287, citing State ex rel. Passv. C.S.T. Extraction Co. (1996), 74 Ohio St.3d 373, 376; State ex rel.Haines v. Indus. Comm. (1972), *Page 7 29 Ohio St.2d 15, 16. We therefore reject relator's claim that this court should issue a writ that grants full relief in mandamus based on the stipulated evidence in the record.
 {¶ 20} Additionally, because the SHO apparently applied an incorrect legal standard in reaching her determination, we also disapprove the commission's contention that "some evidence" supports the SHO's decision of November 2003, and therefore relator is precluded from extraordinary relief in mandamus. See State ex rel. Morris v. Indus. Comm. (1984),14 Ohio St.3d 38, 40 (finding that an evaluator used a much a more stringent standard than that employed by the commission and, therefore, this evaluation could not constitute evidence upon which the commission could rely in reaching its conclusions). The commission's claim that "some evidence" underlies the SHO's order is therefore rejected. We do, however, agree with the commission that the instant matter should be returned to the commission for further review and consideration.
 {¶ 21} After independently reviewing the magistrate's decision, we also find a defect on the face of the magistrate's decision concerning the magistrate's second finding of fact. In his second finding of fact, the magistrate incorrectly referred to relator's hospitalization at St. Alexis Hospital as commencing on July 9, 1974, rather than on July 8, 1974, as stated in the stipulated evidence.
 {¶ 22} Accordingly, finding no other defect or error of law on the face of the magistrate's decision, we conclude that the magistrate properly has determined the pertinent facts and appropriately applied the relevant law to those facts when he recommended issuance of a limited writ of mandamus. Therefore, as amplified here, we adopt the magistrate's findings of fact and conclusions of law as our own, with the exception of the magistrate's second finding of fact, as discussed above. *Page 8 
 {¶ 23} We also overrule relator's objections to the magistrate's decision, as well as the commission's objections to the magistrate's decision to the extent that the commission asserts that relator is not entitled to extraordinary relief in mandamus. We agree, however, with the commission's alternate proposition that the matter should be remanded to the commission for the limited purpose of reconsidering the bureau's 2003 motions to terminate relator's PTD compensation and DWRF compensation and to declare an overpayment of both compensations.
 {¶ 24} In accordance with the magistrate's recommendation, we therefore grant a writ of mandamus that is (1) limited to ordering the commission to vacate its order that terminated PTD and DWRF compensations, effective November 13, 2003, and that declared an overpayment of those compensations from March 14, 2002, through November 13, 2003, and (2) limited to ordering the commission, in accordance with law and consistent with this opinion, to reconsider the bureau's 2003 motions to terminate relator's PTD and DWRF compensations and to declare an overpayment of both compensations.
Objections overruled; limited writ granted.
KLATT and McGRATH, JJ., concur.
[1] According to the record and stipulated evidence, respondent Aluminum Smelting Refining Co., Inc., which was served with relator's complaint and summons, but which failed to answer relator's complaint in mandamus, is no longer in business in Ohio. See, generally, Civ.R. 55 (default judgment).
[2] Since this court appointed a magistrate in this matter, the Local Rules of the Tenth District Court of Appeals were amended, effective April 1, 2007, and Civ.R. 53 was amended, effective July 1, 2006. *Page 9 
 APPENDIX A MAGISTRATE `S DECISION Rendered on October 31, 2006 IN MANDAMUS {¶ 25} In this original action, relator, Roosevelt Perry, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") and disabled workers' relief fund ("DWRF") compensations effective November 13, 2003, and declaring an overpayment of those *Page 10 
compensations from March 14, 2002 through November 13, 2003, and to enter an order reinstating PTD and DWRF compensations.
Findings of Fact: {¶ 26} 1. On July 9, 1967, relator sustained an industrial injury while employed as a laborer for Aluminum Smelting Refining Co., Inc., a state-fund employer. On that date, relator was run over by a bulldozer. The industrial claim was initially allowed for "[b]ack, both hips, stomach and left thigh," and was assigned claim number 67-15194.
 {¶ 27} 2. Relator was hospitalized at St. Alexis Hospital from July 9 to July 19, 1974. Dr. Pete N. Poolos, Jr., was relator's attending neurologic specialist and surgeon. In his discharge summary, Dr. Poolos stated:
 FINAL DIAGNOSIS:
 Post traumatic sciatica neuropathy left. Degenerative arthritis sacroiliac joints. Severe low back and left leg pain.
 It was felt that these findings are permanent and incapacitates [sic] this patient for any type of gainful employment which would require sitting or standing.
 It is felt that this patient falls within the category of a permanently disabled individual for social security purposes.
 {¶ 28} 3. On August 5, 1976, relator moved for PTD compensation.
 {¶ 29} 4. On December 14, 1977, relator was examined by Dr. Asikin Mentari who specialized in physical medicine and rehabilitation. Dr. Mentari wrote:
 IMPRESSION:
 1. Chronic severe pain of entire spine and back secondary to diffused post traumatic myofascitis. Cervical spine on xray show straightening of cervical lordosis and minimal spondy-losis of lower cervical vertebrae. Lumbar spine show un-united right transverse process of L1 vertebra, thoracal spine *Page 11 
xrays show very slight decrease of the height of anterior T7 vertebra.
 2. Chronic left sacro-iliac joint injury as evidence in xray.
 3. Chronic partial injury of the left sacral plexus.
 4. Status post lumbar sympathectomy. Patient has no complaint about his abdomen. His abdomen is soft and non-tender.
 5. Early osteoarthritic changes in both hip joints bilaterally.
 DISCUSSION:
 1. This patient is severely disabled and incapable of carrying out any kind of work. He has difficulty in selfcare and ambulation. He may be considered permanently and totally disabled as a laborer, he may also be considered to have 75% permanent partial disability for the body as a whole.
 {¶ 30} 5. In June 1978, the commission awarded relator PTD compensation beginning June 16, 1977. The commission relied upon the medical reports from Drs. Poolos and Mentari.
 {¶ 31} 6. On February 14, 2001, the Cleveland Special Investigations Unit ("SIU") of the Ohio Bureau of Workers' Compensation ("bureau") was informed by a bureau claims service specialist that a PTD status questionnaire mailed to relator's listed address had been returned unanswered and that relator's listed telephone number had been disconnected.
 {¶ 32} 7. Over one year later, on March 8, 2002, SIU special agent Cirino established surveillance at a residence on Bosworth Road in Cleveland, Ohio, believed to be the residence of relator. At 9:20 a.m., Cirino observed a red Geo Prism registered to relator pull into the driveway. Cirino observed a man fitting relator's physical description ("subject") exit the vehicle and enter the front door of the residence. At 9:23 a.m., Cirino *Page 12 
observed the subject exit the residence and return to the vehicle. Subject was carrying a brown paper bag and wearing a blue coat with maroon sleeves, blue jeans and calf high rubber boots. Cirino followed the subject driving the vehicle to American Pride Car Wash located at the corner of East 91st Street and Union. Subject pulled into the car wash back parking lot at 9:45 a.m. Cirino observed subject exiting the vehicle and approaching the front of a two bay garage used for car washing. Approximately eight to ten men were observed cleaning and wiping down cars after being washed in one of the bays. According to Cirino's report:
 * * * Claimant was in and out of site [sic] of Cirino and appeared to be speaking with the rest of the individuals at the location. Cirino tried to re-position in order to observe claimant but was very difficult as claimant was moving from front to back and in and out of the building. Several photos of the business were taken and several minutes of digital video was taken of the claimant at this location.
 1027 hours Cirino returned to previous surveillance position and observed that the claimant's vehicle was not there. Cirino terminated surveillance at this time.
 {¶ 33} 8. On March 14, 2002, Cirino established surveillance at the car wash from 12:01 p.m. to 12:30 p.m. According to his report, Cirino:
 * * * [O]bserved Claimant opening vehicles and carrying a vacuum cleaner to vacuum various vehicles as they came out of the washing bay.
 1230 hours Cirino terminated surveillance while subject was still in view and working at the car wash. Cirino obtained 11 digital photos and 20 minutes of digital video of the subject working.
 {¶ 34} 9. On March 15, 2002, beginning at 7:45 a.m., Cirino observed subject "going back and forth" from the Bosworth residence to the red Geo Prism "carrying clothes/towels and loading them in the trunk." *Page 13 
 {¶ 35} At 7:58 a.m., Cirino observed subject depart the residence in the Geo Prism. Cirino followed subject to the car wash.
 {¶ 36} At 8:25 a.m., Cirino and special agent Brickman established stationary surveillance. According to their report:
 0825 hours to 1030 hours Agent Brickman obtained several hours of video tape of the claimant working at American Pride. Agent Cirino performed several drive-by of the business and observed the subject washing cars in one of the bays of the three bay garage.
 {¶ 37} 10. On September 9, 2003, special agents Warren and Bratz interviewed Anthony Mosley who identified himself as relator's nephew and the owner of the car wash. According to the special agents' report:
 * * * Mosley stated that approximately four people work at one time and more people will start to work when the business picks up during the day.
 When asked if Perry has worked at the Running P car wash, Mosley stated that Perry has "helped out" in the past. When asked to clarify this, Mosley stated that Perry would "hang out" in the driveway of the car wash and help out if business became busier. Among the tasks that would be performed by Perry, according to Mosley, would be the washing of the cars, vacuuming, and/or drying them. Mosley stated that for Perry's "helping out" he would receive some cash or money for lunch. Mosley stated that the workers at the Running P were paid cash daily in the approximate amount of $25-$30. Mosley did not need to pay Perry a lot of money because he was receiving checks from the state for his disability. Prior to his open heart surgery, Perry would come to the Running P four days per week and help out, according to Mosley. Perry would wear his back brace when he was there.
 {¶ 38} 11. On September 9, 2003, Cirino and special agent Bolbach interviewed relator at his Bosworth Road residence. According to their report: *Page 14 
 Cirino asked how he was managing with his disability on a daily basis. Perry stated that he recently had an operation in April of this year for prostrate cancer. Cirino asked how is he feeling since the surgery. Perry indicated that the prognosis looks pretty good. * * *
 * * *
 Cirino informed Perry that BWC has received information that he was working at a car wash. Perry asked what car wash and Cirino indicated that he was asking if he has ever worked in any capacity at a car wash in the area. Perry informed Cirino that his brother's nephew owns a car wash on Union Avenue in Cleveland. Cirino asked the name of his nephew. Perry indicated his name was Anthony Mosley. Cirino asked if Perry has ever worked at this car wash. Perry stated that he has never worked there but that he does go there and sit in a chair. Perry indicated further that he could not physically work because he is in to[o] much pain. Cirino asked Perry to clarify that he has never worked there. Perry stated again that he has not worked there at all. Bolbach asked Perry to estimate how many times a month he goes to the car wash. Perry indicated that he goes there maybe once or twice a month but that he hangs out and talks with his nephew's girlfriend who sells clothes at the car wash.
 Cirino asked Perry how long Anthony Mosley, his nephew, has owned the car wash. Perry indicated that he has owned it for about eight years and that prior to that his brother, Matthew Perry (deceased) owned it for about three to four years. Cirino asked the name of the car wash. Perry stated that there was no name.
 Cirino asked once again if he ever worked at the car wash. Perry, again, stated that he has not worked there and that he would only go there to hang out. Cirino explained to Perry that he had information that he was working there, more specifically video and pictures of him working. Perry denied working once again. Cirino presented Perry with several photos obtained by Cirino on 03-14-2002 showing Perry vacuuming a vehicle. Perry stated that it was him in the photos but that he would only joke with the other guys by using the equipment (vacuum cleaner). Cirino explained that he has obtained video of the subject working and that it did not appear that he was joking with the other employees. Perry stated that he may have cleaned his own vehicle. *Page 15 
Cirino explained to Perry that he observed Perry cleaning other cars than his own. Perry indicated that it could have been his brother because they look similar. Cirino explained to Perry that he followed Perry from his residence the day of the video and observed what he was wearing when he left his residence and it appeared in the video and photos that the same person who left the residence was the one cleaning the vehicles. Perry stated that he did not work at the car wash and that if he wanted to make money he would have returned to work as an electrician with his other nephew, Eric Perry.
 Bolbach asked Perry if he ever received any money for helping out at the car wash. Perry stated that his nephew would lend him money sometimes but it was not often because Perry does not like to rely on other people for money. Perry stated that he has never worked or received any money for working.
 Cirino explained to Perry that he has observed him working on several occasions in 2002 and that he had video and pictures to prove it. Perry stated that he is 65 years old and he cannot work. Further, that he if he wanted to work he would of when his brother owned the car wash.
 Bolbach explained to Perry that several BWC agents interviewed Anthony Mosley earlier in the morning and that these agents indicated that Anthony Mosley told them that he (Perry) worked vacuuming, washing and drying cars and that he was paid some cash. Perry stated that Anthony Mosley was lying and that he (Perry) is a man of his word and relies on God as his savoir.
 Cirino explained to Perry that he was going to file his report and that the reason for the visit today was to get his side of the story. Cirino further explained that the report would be sent to him and his attorney as well as the Industrial Commission and that a hearing would be set for him to argue the report.
 Perry indicated that Cirino and Bolbach will have [sic] do what they have to do and indicated that he [sic] if he was observed washing cars it was either his or his sister's car or he was playing around with the guys. * * * *Page 16 
 {¶ 39} 12. On September 30, 2003, the bureau moved to terminate PTD and DWRF compensations and for a declaration of an overpayment of both compensations beginning March 8, 2002. The bureau further moved that the overpayment be collected pursuant to R.C. 4123.511(J). The bureau did not allege that relator had obtained the compensation fraudulently.
 {¶ 40} 13. In support of the motion, the bureau filed a report of the SIU investigation. The report contains the factual observations of the SIU agents presented above.
 {¶ 41} 14. On November 12, 2003, Mosley executed an affidavit stating: "I Anthony Mosley owner of Running P's Carwash at 9014 Union Ave. did not pay Roosevelt Perry any money at any time for the help he provided at the carwash."
 {¶ 42} 15. Following a November 13, 2003 hearing, a staff hearing officer ("SHO") issued an order granting the bureau's motion. The SHO's order explains:
 The Staff Hearing Officer grants the BWC request to terminate Permanent Total Disability Compensation, effective 11/13/2003, and the date of this hearing. The Staff Hearing Officer finds that Injured Worker was working and is, therefore, not entitled to continued Permanent Total Disability Compensation.
 The Staff Hearing Officer grants the BWC request to declare an overpayment on Permanent Total Disability Compensation from 03/14/2002 through 11/13/2003, the date of this hearing. The Staff Hearing Officer finds that Injured Worker was working during this period, thus creating an overpayment. The overpayment is to be recouped pursuant to ORC4123.511(J).
 The Staff Hearing Officer grants the BWC request to terminate DWRF, effective 11/13/2003, the date of this hearing. The Staff Hearing Officer finds that Injured Worker was working and is[,] therefore, not entitled to continue Permanent Total Disability Compensation. *Page 17 
 The Staff Hearing Officer grants the BWC request to declare an overpayment of DWRF from 03/13/2002 through 11/13/2003, the date of this hearing. The Staff Hearing Officer finds that Injured worker was working during this period, thus creating an overpayment. The overpayment is to be recouped pursuant to ORC4123.511(J).
 This order is based on the Special Investigation Unit report, with the surveillance tapes, dated 09/30/2003. All the evidence, testimony, and arguments submitted as of the date of this hearing have been reviewed and evaluated to render this decision.
 {¶ 43} 16. On May 20, 2005, relator moved for the allowance of additional conditions in the claim. On September 15, 2005, the bureau issued an order additionally allowing the claim for "lumbosacral spondylosis; arthropathy NOS-pelvis; lumbosacral spondylosis bilateral." Apparently, the bureau's order was not administratively appealed.
 {¶ 44} 17. On October 27, 2005, relator filed an application for PTD compensation.
 {¶ 45} 18. Following a March 22, 2006 hearing, an SHO issued an order awarding PTD compensation beginning September 29, 2005. The SHO's order states:
 The claimant was born on 05/29/1938 and attended school through the fifth grade. The claimant's employment has consisted only of laborer duties. The claimant was injured on 07/09/1967 and this claim has been allowed for the conditions as listed above. The claimant's treatment has included a left lumbar sympathectomy, L1-2 on 08/25/1967. The claimant was then granted permanent and total disability compensation effective 06/16/1977 by Industrial Commission order dated 06/13/1978. Subsequently, permanent total disability compensation and DRWF [sic] disabled worker's relief fund benefits were terminated effective 11/13/2003 based upon the Staff Hearing Officer order of that date which found that the claimant was working from 03/14/2002 through 11/13/2003. The claimant indicates via testimony at this hearing that he last worked at the above described position in a car wash in 2002 as he had surgery for prostate [sic] cancer and treatment thereafter in 2003. The Staff *Page 18 
Hearing Officer notes the additional allowances of "LUMBO-SACRAL SPONDYLOSIS, ARTHROPATHY OF THE PELVIS and LUMBOSACRAL SPONDYLOSIS BILATERAL" granted by Bureau of Workers' Compensation order dated 09/15/2005 as presenting new and changed circumstances since the previous findings. It is noted that claimant was referred to Bureau of Vocational Rehabilitation back in the 1970s/1980s, but no value for rehabilitation was found due to the claimant's injuries and educational deficits.
 The Staff Hearing Officer accepts and relies upon the 09/29/2005 report of Eric Lajiness, D.C., who finds the claimant is permanently and totally disabled and unable to perform any sustained remunerative employment activity.
 Alternately, the Staff Hearing Officer would rely upon the 01/03/2006 report of Robin G. Stanko, M.D., who indicates that the claimant is capable of performing alternative sedentary sustained remunerative employment activity with rare walking and bending and no kneeling, crawling or squatting.
 However, even accepting this opinion, the Staff Hearing Officer finds that the claimant is without the vocational capability to perform alternative sedentary employment. The claimant's current age of 67 is found to be [a] neutral factor which does not enhance nor prohibit his ability to perform sustained gainful activity. However, the claimant's education resulting in only a fifth grade education as well as his previous work experience in only light, medium and heavy labor positions, are both found to be negative vocational factors which provide the claimant no transferable skills to perform alternative sedentary types of employment. Therefore, based upon this alternative theory, the Staff Hearing Officer would find that the claimant is indeed permanently and totally disabled and unable to perform any sustained sedentary gainful employment. Therefore, the claimant's application is granted as indicated in this decision.
 Permanent total disability compensation is ordered to begin on 09/29/2005 based on the report of that date of Dr. Lajiness, the first report on file supporting this application.
(Emphasis sic.)
 {¶ 46} 19. On April 4, 2006, relator, Roosevelt Perry, filed this mandamus action. *Page 19 
Conclusions of Law: {¶ 47} Two issues are presented: (1) whether the commission applied the proper standard for determining whether relator's activities warranted termination of PTD and DWRF compensations and a declaration of overpayment; and (2) if the commission failed to apply the proper standard, could the commission's application of the proper standard to evidence to be weighed result in an order terminating compensations and declaring an overpayment, thus requiring this court to issue a limited writ of mandamus.
 {¶ 48} The magistrate finds: (1) the commission failed to apply the proper standard for determining whether relator's activities warranted termination of compensations and declaration of an overpayment; and (2) the commission's application of the proper standard to evidence to be weighed could result in an order terminating compensations and declaring an overpayment such that this court should issue a limited writ of mandamus.
 {¶ 49} Accordingly, as more fully explained below, it is the magistrate's decision that this court issue a limited writ of mandamus.
 {¶ 50} To appropriately review the SHO's order of November 13, 2003, at issue here, it is necessary to contrast the standard for terminating temporary total disability ("TTD") compensation against the standard for terminating PTD compensation. The TTD standard is set forth succinctly in State ex rel. Ford Motor Co. v. Indus. Comm., 98 Ohio St.3d 20,2002-Ohio-7038. The PTD standard is succinctly set forth in State exrel. Lawson v. Mondie Forge, 104 Ohio St.3d 39, 2004-Ohio-6086.
 {¶ 51} In Ford, at ¶ 18-19, the court states: *Page 20 
 TTC [temporary total disability compensation] is prohibited to one who has returned to work. R.C. 4123.56(A); State ex rel. Ramirez v. Indus. Comm. (1982), 69 Ohio St.2d 630, 23 O.O.3d 518, 433 N.E.2d 586. * * *
 Work is not defined for workers' compensation purposes. We have held, however, that any remunerative activity outside the former position of employment precludes TTC. State ex rel. Nye v. Indus. Comm. (1986), 22 Ohio St.3d 75, 78, 22 OBR 91, 488 N.E.2d 867. We have also held that activities medically inconsistent with the alleged inability to return to the former position of employment bar TTC, regardless of whether the claimant is paid. State ex rel. Parma Community Gen. Hosp. v. Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E.2d 1143, ¶ 15. Activities that are not medically inconsistent, however, bar TTC only when a claimant is remunerated for them. Id. at ¶ 14-15, 767 N.E.2d 1143. Work, moreover, does not have to be full-time or even regular part-time to foreclose TTC; even sporadic employment can bar benefits. State ex rel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113, 717 N.E.2d 336.
 {¶ 52} In Lawson, the court states at ¶ 16-21:
 PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167, 31 OBR 369, 509 N.E.2d 946. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, State ex rel. Kirby v. Indus. Comm., 97 Ohio St.3d 427, 2002-Ohio-6668, 780 N.E.2d 275; (2) the physical ability to do sustained remunerative employment, State ex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316, 770 N.E.2d 576; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. See State ex rel. Timmerman Truss, Inc. v. Indus. Comm., 102 Ohio St.3d 244, 2004-Ohio-2589, 809 N.E.2d 15, ¶ 26.
 The first criterion is the cleanest. Nothing demonstrates capacity better than actual performance. No speculation or residual doubt is involved. Unfortunately, that is not always the case where the other two criteria are involved[.] * * *
 * * * *Page 21 
 Neither "sustained" nor "work" has been conclusively defined for workers' compensation purposes. As to the later, clearly, labor exchanged for pay is work. Schultz also teaches that unpaid activity that is potentially remunerative can be considered for purposes of establishing a physical capacity for remunerative employment. This principle, however, should always be thoughtfully approached, particularly when PTD is at issue.
 One of the most enduring (though not often explicitly stated) misconceptions about PTD is that once it is granted, the recipient must thereafter remain virtually housebound. This is a fallacy. PTD exempts no one from life's daily demands. Groceries must be purchased and meals cooked. Errands must be run and appointments kept. The yard must be tended and the dog walked. Where children are involved, there may be significant chauffeur time. For some, family and friends shoulder much of the burden. Others, on the other hand, lack such support, leaving the onus of these chores on the PTD claimant.
 These simple activities can nevertheless often generate considerable controversy. That is because all of these tasks are potentially remunerative. From the school cafeteria to the four-star restaurant, people are paid to prepare meals. People are paid for lawn and child care. Many people earn their living behind the wheel. State ex rel. Parma Comm. Gen. Hosp. v. Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E. 2d 1143, acknowledged this and cautioned against an automatic disqualification from compensation based on the performance of routine tasks, regardless of their potential for payment. We instead compared the activities with claimant's medical restrictions to determine whether they were so inconsistent as to impeach the medical evidence underlying the disability award.
(Emphasis sic.)
 {¶ 53} The Ford and Lawson cases show the critical distinction between the standards for terminating TTD and PTD compensation. As Ford makes clear, work does not have to be full time or even regular part-time to foreclose TTD; even sporadic employment can bar TTD benefits. However, as the Lawson court makes clear, to *Page 22 
terminate PTD compensation based upon the claimant's activities, there must be evidence of: (1) actual sustained remunerative employment; (2) the physical ability to do sustained remunerative employment; and (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award.
 {¶ 54} Here, citing the SIU report and surveillance tapes, the SHO's order of November 13, 2003, finds that relator "was working" from March 14, 2002 through the hearing date. March 14, 2002 corresponds to the date that Cirino observed relator "opening vehicles and carrying a vacuum cleaner to vacuum various vehicles as they came out of the washing bay." On March 14, 2002, Cirino obtained 11 digital photographs and 20 minutes of digital video during the 29 minutes that he observed relator at the car wash.
 {¶ 55} As this court noted in State ex rel. Stettler v. Mid AlanticCanners Assoc, Inc., Franklin App. No. 04AP-1290, 2005-Ohio-5646, at ¶ 9, that a PTD recipient "engaged in some degree of work for remuneration does not automatically satisfy the standard for terminating" PTD compensation. Moreover, the SHO's order of November 13, 2003, fails to even address relator's receipt of remuneration.
 {¶ 56} As relator points out here, the SHO's order of November 13, 2003, does not even mention the concept of "sustained remunerative employment" nor are any cases cited that address the concept. Also, there is no finding that relator engaged in activities that impeach the medical evidence upon which the PTD award was premised.
 {¶ 57} Given the above analysis, the SHO's order of November 13, 2003, strongly suggests that an incorrect standard was applied by the hearing officer in reaching the decision to terminate PTD and DWRF compensations and to declare an overpayment. *Page 23 
 {¶ 58} Given that the commission abused its discretion by applying an incorrect standard, the issue is whether the application of the correct standard to the evidence to be weighed could potentially result in termination of compensation and declaration of an overpayment such that this court should issue a limited writ of mandamus rather than a full writ of mandamus.
 {¶ 59} As previously noted, Lawson sets forth three bases for the termination of PTD compensation. The first basis, actual sustained remunerative employment is clearly not present here under any reasonable weighing of the evidence. The only remuneration that relator arguably received for his activity at the car wash was the lunch money Mosley stated he gave to relator. Working for lunch money is hardly sustained remunerative employment. Clearly, there is no evidence that relator actually engaged in sustained remunerative employment.
 {¶ 60} The second basis, under Lawson, for terminating PTD compensation is the physical ability to do sustained remunerative employment. The Lawson court cites State ex rel. Schultz v. Indus.Comm., 96 Ohio St.3d 27, 2002-Ohio-3316, as an example of a case justifying PTD termination under this basis. Schultz has been cited for the proposition that "[a] claimant who does sustained remunerable activity without pay demonstrates that he/she is capable of doing that same work for remuneration." State ex rel. Alesci v. Indus. Comm.,97 Ohio St.3d 210, 2002-Ohio-5932, at ¶ 18.
 {¶ 61} The evidence of record falls short of showing sustained remunerable activity that demonstrates a capacity for sustained remunerative employment.
 {¶ 62} Viewing the evidence in a light most favorable to the bureau, relator was observed on March 14, 2002, for a period of 29 minutes. During that time, an SIU agent *Page 24 
observed relator "opening vehicles and carrying a vacuum cleaner to vacuum various vehicles as they came out of the washing bay." On March 15, 2002, during a two hour period, an SIU agent observed relator "washing cars in one of the bays of the three bay garage." In addition to those two instances of surveillance, Mosley stated to the SIU agents during his interview that relator had washed, vacuumed and dried cars at the car wash. Mosely also stated that, prior to his heart surgery, relator would come to the car wash four days per week and help out.
 {¶ 63} Mosely never stated how many hours relator "helped out" on the days that he came to the car wash. Mosley did indicate, however, that some of the time relator would "hang out" and that he would "help out" only when business became busier.
 {¶ 64} Assuming that relator's activities at the car wash were remunerable to the extent that relator washed, vacuumed and dried cars, there is no evidence that this remunerable activity was sustained activity as was the case in Schultz. The Lawson case also supports the conclusion that relator's activities here cannot be viewed as sustained even though they may be viewed as remunerable. In short, there is no evidence upon which the commission could determine that relator engaged in sustained remunerable activity.
 {¶ 65} The third basis under Lawson for terminating PTD compensation is activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. In the magistrate's view, the third basis is problematical for relator, even though the commission never addressed the issue in its order. *Page 25 
 {¶ 66} In awarding PTD compensation, the commission relied upon the reports of Drs. Poolos and Mentari. Dr. Mentari concluded:
 1. This patient is severely disabled and incapable of carrying out any kind of work. He has difficulty in selfcare and ambulation. He may be considered permanently and totally disabled as a laborer, he may also be considered to have 75% permanent partial disability for the body as a whole.
 {¶ 67} Dr. Poolos concluded: "It was felt that these findings are permanent and incapacitates [sic] this patient for any type of gainful employment which would require sitting or standing."
 {¶ 68} Given the SIU report, this magistrate cannot find that there is no evidence upon which the commission could conclude that relator's activities impeach the medical evidence underlying the award.
 {¶ 69} Significantly, the commission's original award of PTD compensation was not premised upon analysis of any nonmedical factors, but was premised solely upon a lack of any residual functional capacity for sustained remunerative employment. That is to say, the medical evidence underlying the award indicates that even sustained sedentary work is precluded. Moreover, Dr. Mentari's report strongly suggests that relator is incapable of performing any labor at all, sustained or otherwise.
 {¶ 70} In the magistrate's view, it is not the duty of this court in this action to determine whether relator's activities impeach the medical evidence underlying the original PTD award. That duty remains with the commission.
 {¶ 71} Accordingly, it is the magistrate's decision that this court issue a limited writ of mandamus ordering the commission to vacate the SHO's order of November 13, 2003 *Page 26 
and, in a manner consistent with this magistrate's decision, enter a new order that determines the bureau's motion. *Page 1